The next case, 418-0372, Bucaro v. Payne et al, for the appellant is Dono Angelini, you are he, sir? Is that pronounced correctly? Yes, sir. Okay. And for the appellee is Mr. Vealy and Mr. Boble? Yes, sir. Is that pronounced correctly, sir? Yes. Mr. Boble, you'll be Mr. Vealy? Yes, sir. I also want to mention we ask you to be here early so we can start early if the court is ready to do so. We are, you are here, I thank you for that and we'll proceed. Okay, Mr. Angelini, you may proceed. Thank you, Your Honor. May it please the court? Counsel. I don't believe that I'm delusional or fail to appreciate the open and obvious issue in this case. I pursued this case and will continue to pursue this case because I believe that this injury and this accident was foreseeable. It was foreseeable to Mr. Payne, it was foreseeable to Janine Payne. And that's really the issue in open and obvious cases is foreseeability. The reason that, you know, open and obvious cases are dismissed at summary judgment is that they're so open and obvious that it's not foreseeable that an injury of the nature that is caused by the open and obvious condition can happen or that there's no, there's very little likelihood of harm as a result. In this particular case, I believe this injury was incredibly foreseeable. The reason being is that it falls outside the standard fire cases because Lauren Beccaro did not place herself into fire. She did not walk into fire, she did not step into fire, she was not even injured upon fire. She was injured when she fell from a perimeter that was created by Samuel Payne into embers that were directly adjacent to this perimeter. It's the synergy between this massive bonfire, the embers that emanated from the bonfire and the perimeter that was set up around the bonfire that caused this injury. This synergy is what caused the injury to Lauren Beccaro. The synergy was created by the defendant. We know that it was foreseeable that this type of injury could occur because he actually contracted to provide security for this type of incident. He had a bunch of college students coming in, he knew they were going to be intoxicated, he contracted to provide security services to protect these individuals from any type of conditions that could be caused. He didn't provide those services but he knew that this was or could be foreseeable. The cases cited by the defendant regarding fire, POR and Samson, are much different. In the POR case or in the Samson case, those issues and those cases dealt with whether a minor or a young child could appreciate the dangers of fire. Lauren Beccaro admits that she could appreciate the danger of fire. She knew that fire could cause an injury to her. That was not the issue in the case. And even a young minor, a four-year-old kid, could appreciate the dangers of fire. But in that case, the appellate court specifically held there was no allegation in this case. The candle that was on this shelf or on this counter was placed improperly. There was any negligence that surrounded it. It was just the pure allegation that the children could not appreciate the danger of fire. Foreseeability is the issue. And it will always be the issue in this type of case. We understand that fire is something that Lauren Beccaro could appreciate. But the combination of the fire, the massive fire that was created, the embers that emanated from that fire and the perimeter that was created around that fire caused the injury for Lauren Beccaro. This accident occurred, the injury occurred when she was walking backwards towards the fire. Is that correct? Well, she wasn't walking backwards towards the fire. She was walking between bales of hay that were set as a perimeter. Well, the fire was behind her as she was walking backwards? It was, Your Honor. Okay. Would the case be different if everything were the same except she was walking in a direction facing the fire? If she was walking towards the fire and placed herself into the fire, and that was kind of the case, I think there was the Burning Man case, the Rock Island case, where somebody had walked into the ashes, it would be different. I think it would be different. If somebody would specifically place themselves into the fire itself. Well, I'm not talking about, she tripped. She did. So it's not that she intentionally placed herself there. She was walking backwards and tripped, fell into the fire. What if she were walking in the direction of the fire and tripped and fell into the fire? Would that be the same case? No, I don't think it would be, Your Honor. I mean, the reality is she tripped at the perimeter. She didn't trip in the embers. She didn't fall from the embers. What are you calling the perimeter? The perimeter would be the bales of hay that were set. Oh. So, at least according to the attorney for Samuel Payne, and to Mr. Payne himself, he set those bales as a perimeter. Just for clarification, I thought your client said she tripped on something and she didn't know what it was. Correct. Which was located about one foot from the embers. Correct. Well, those bales weren't one foot from the embers. Yes. The bales are one foot from the embers. Yes, yes. As described by Lauren Baccaro, the fire itself extended maybe seven feet. The embers were maybe another two, three feet. She fell right at the perimeter between the bales of hay. Well, this isn't in evidence, obviously, but just a little good old-fashioned common sense since I've been to a few places where there are bonfires, I can't imagine how a bale could be one foot from the embers and not catch fire. So, to me, that's hard to envision. If that's what the facts are, they are. But, wow, is what I would say to that, I guess. Well, I don't think there's any evidence. And that would be for the jury to decide. I mean, if the jury decides, look, man, that doesn't look like it's even remotely possible that the bale could be that close to the embers and that she would have to fall several feet from that, that's a question for the jury to determine. And they may determine that. And they may say, look, she shouldn't have been batting anywhere close to a fire when she couldn't get into a picture. But that's for a jury to determine. I don't think, as a matter of law, it could be decided that the condition that was created is open and obvious to her. She specifically testified that she didn't appreciate that there were embers that were emanating from the fire or that the embers were that close to her. Again, she did not walk into the fire. She paid to be there. You know, these cases that deal with the situations where, you know, there's this synergy. The case, I think, was the Mount Zion case where there was a pedestal and then a fence and then a pool. Or even a case, I think, I can't remember the name of the case, but it was a case where there was a swing and then the river and then the ladder that went to the swing. Those were cases where these were trespassers. She paid to be there. She paid this man to set the perimeter. Why does that matter? Because she did what she did where she sat where she placed her. Because that really goes to the reasonableness of her conduct. Because in open and obvious, you have to look at somebody who's acting in a reasonable manner. How would a reasonable person deal with the condition that was presented? What evidence is there in the record of what other people were doing at this time? For example, were there people sitting on the bales to be near the fire? Yes, that was what Mr. Payne specifically testified. That was the purpose of setting, one of the purposes of setting the bales was so the people could sit on them for some type of warrant. All I'm asking and all I was ever asking is if you're going to set the bales around a massive bonfire, set them at a distance that is reasonable so that somebody who's in that direct area wouldn't come into contact with the embers that emanates from the massive fire. And I just think that that's not unreasonable to ask. In the totality of the circumstances where he has all these people coming out there, 200 or so people, who he describes as a sleepy situation, he knows they're coming in intoxicated and leaving intoxicated. He creates this bonfire, which it is a dangerous condition or a potentially dangerous condition. Is it unreasonable to ask that he maybe use a little bit more precaution than he did  Given, let me do a hypothetical, given what you've described as being in the record, would a person who stood up from the bales and took a step, a longer step perhaps, maybe it's a tall person, take a longer step than I would, is it possible that they could have burned their feet by stepping onto these embers as the embers apparently, as the fire continued, the embers got closer and closer to the bales of hay? It may. That's a question of fact though. I know. It's a question of law as to what a juror might say if somebody took a massive step back or she took a big step back. Well, let's make it a regular step. Okay. I stand up and instead of turning to step over the bale, I take a step forward. You're suggesting that those embers are so close to the hay or to the bales that my feet, if I take any step at all, unless it's tiny, are going to come into contact with the embers. It is possible. Okay. The hay may have acted to help create the embers. I mean, there was debris all around that area. Was it hay or straw? Yeah, hay or straw. Was it hay or straw? I don't know. I don't know. It was always described as a bale of hay. I'm from Chicago. I wouldn't know this. You wouldn't know how much a bale of straw or hay weighs. I would have no idea. Would you have any idea, like when they're set up around a bonfire, whether people move them around as the flames get higher or lower? For example, the perimeter may have been set up one way, but the first person that comes in to sit around the fire may move his or her bale back three or four feet or up forward three or four feet. There was no testimony that that bale that she was sitting on was ever moved. There was nothing that testified. There was some conflicting testimony from Mr. Payne as to whether there was movement of those bales. Is there any testimony about whether the people sitting around the fire were all sitting with their backs to the fire? No, only Lauren McCarroll testified to that. Okay, because the way you described it, I don't see how a person could sit on the bale with their feet out in front of them without their feet being in the embers. She was sitting with her right. Right. Unless the bales were set further back from the fire itself. Well, you said the perimeter was a foot away from the embers, I thought. Correct. At least according to the testimony of Lauren McCarroll. She didn't fall far, and she doesn't even know if she took a step back towards the embers. She took a step back to get between two bales when she fell. But we do know for sure the purpose of her standing up with her back to the fire was to make sure the fire was behind her so that it would be in the picture. Right. And Mr. Payne testified that that often provided a backdrop for pictures, which I could argue and may argue to a jury if I ever get there, if you allow me to, that he knew that this provided a backdrop for pictures could have been reasonably foreseeable to him to even appreciate that potential distraction. And that's kind of the distraction argument I had. If there's a distraction here, it would be in the fact that Mr. Payne knew that this potential for providing a backdrop put these people in a position where they could be at risk. I'll reserve the rest of my argument. Thank you. Okay. Thank you, counsel. Who will go first? Okay. Mr. Bobo. Please, the court. Counsel. The court's well aware this is a case about its legal unit. And what is a mando is doing to protect another individual against an open and obvious danger? In this case, you know, it's a bonfire. And the risk is dependent to that danger, the risk that accompanied that bonfire. And the answer, and the answer that has been in the case law for decades, is that a mando has no duty in these circumstances. Jeanine Payne had no duty to warn the parlor and the trial court properly granted summary judgment. I'm going to talk a little bit about the open and obvious doctrine, a little bit about the traditional duty analysis, and then just finally briefly the distraction exception. The open and obvious, I don't think we have a contest that the bonfire is an open and obvious condition. But Mr. Angelini's argument is that we've got this combination of the fire, the embers, the hay bales, and that somehow makes the danger less obvious or latent. And litigants have tried this argument. The Illinois Supreme Court has rejected it at least twice. We've got the Mount Zion Bank and Trust case where we've got the combination of a pedestal next to a fence, which allows a child to climb the fence and access a swimming pool. Litigant there says, well, we know the swimming pool is in an open and obvious danger, but the pedestal and the fence combined make it a latent danger. So it shouldn't have some duty. The Illinois Supreme Court says, no, you have no duty in that situation. It's an open and obvious danger. Again, in the Bowdoin case, this almost 30-year-old case, it was a 15-year-old who fell from a tree. And in that case, there was a combination of a tree, a rope swing, a ladder, and an irresistible combination of the 15-year-old kid. And the court said that that child, the 15-year-old, still should have understood the danger of height. And here, again, the combination of those elements doesn't make it latent. It doesn't make it less dangerous. The thing that caused the injury, the weight, that condition is known. The risk is known. Let me ask you a question. And I don't know what difference it may make if this was a commercial enterprise. But I presume the landowner knows because he's had other bonfires, correct? I mean, is that in the record? Yes. Yeah, he's hosted these before. So this is just my understanding from anecdotes that students get on a party bus and drink on the way to the destination. And when they arrive at the destination, they continue to use alcohol. And the property owner promised some form of security, whatever that was. And the property owner knows that the students are likely to be, if not intoxicated, at least lively and joyful and happy and moving around. Does that place any additional duty, knowing those circumstances, assuming that that's in the record and that's shown or there's no dispute about it, to put the bales farther back or to have some barrier that would retain the embers? I'm thinking to myself, are those fire pits that are made out of steel, are those also meant to contain the embers? Or do embers still creep out under the bottom of those fire pits? I know that's long, but I think you understand what I mean. I understand your question, Justice McCain. In this case, the answer is no. It doesn't create any additional duty. The facts of this case, one of the parties said she had consumed alcohol, but she was 100 percent in control of the barrels. And so that place is good. I also want to point out, Janine Payne is the landowner here, but she doesn't occupy the property. Her son, Sam Payne, occupies the property. There's nothing in the record that says Janine Payne even knew that this event was occurring. She had been to one of these barn dances before for 15 to 20 minutes just to kind of check out and see what her son was doing on the property. But there's nothing to indicate that she knew the barn dance was happening, that she was there, that she placed the perimeter, that she started the fire, that she knew where the bales were in relation to the embers. And while we're on that topic, I'm sorry, I don't have the page in the record, but it's page 69 of one of the parties' depositions. And she says that the bales were two feet from the embers. And she describes in other places that there's sort of a diameter of embers that's a couple feet around the fire, and the fire itself is about seven feet in diameter. So all in all, it would have been about 10 feet by 10 feet. And with respect to the movement of the bales, Sam Payne did say that those bales were being moved. And further to your question, Mr. Englishman, you talked about, well, we've got a chaotic environment. We've got people who are intoxicated. Sam Payne knows that there are going to be 200 college students there who are intoxicated. None of those issues play into the foreseeability of this specific injury. If you have folks who are intoxicated and there's a fist fight, something like that, maybe that's more foreseeable. But this open and obvious condition, someone backing towards a fire, after she's sat on a hay bale, or it's actually a straw bale, for 15 or 20 minutes, she feels the heat on her back. She knows it's there. And she has to know the risk, not only, well, the flames can burn me. She has to know I can be injured from smoke if I'm sitting too close. I can be from the embers that are coming off. She's been to these barn gates before where there's a fire in the same place. If you've sat by them, you know that you can hear a little pop of water that's going to come off from time to time. So these are all good risks that are attendant to the open and obvious risk of a barn fire. I mean, I don't think counsel has done anything to distinguish the facts of this case from the facts of the Mount Zion Bank and Trust case. The Logan case, where those other litigants made this, well, we've got this synergy, this combination of elements. The Logan case wasn't mentioned in the report. The Mount Zion Bank and Trust, I don't think there's a meaningful distinction. Well, there's no indication that the litigants, in most cases, created the provision or contributed to creating the provision. Jeanine Payne, in this case, hasn't contributed to this provision. And the perimeter itself makes it more obvious of the danger and not less obvious because she's been sitting there. She knows that it's hot, and if she backs up, she can be injured. The traditional duty analysis, we've got those four factors as the court goes. And the open and obvious essentially takes out the first two factors. The reasonable foreseeability, the likelihood of injury. It's not foreseeable because it's open and obvious. And what you do is you look at the third and fourth factors. And that's what was done with your case, B-I-E-R. And the court there said, you know, even though the third and fourth factors may weigh a favor in plaintiff, the first and second is positive. And a lot of courts don't even look at the four-factor analysis. They just say, well, it's open and obvious that those two factors are just positive. And we talked about this argument that plaintiff argues, well, it was foreseeable because it was a chaotic situation. There were folks climbing on a bullet pile. There were people falling off of a hay rack ride. But again, there's no evidence that any of that alleged chaos was around the bonfire that somehow caused the morning before overfall. She said, my friend was taking my photograph. I took a step back and she became the hay bales. I felt something go. She testified she didn't look at the ground, she wasn't paying attention, and that she simply slipped and fell. Again, with respect to the traditional duty analysis in the third and fourth lawn, gene pain wasn't there. There's nothing in the record that says she knew about this. And so, you know, imposing a burden on her that she has no opportunity to correct or fix any potential injury simply is a pathological error. Finally, the distraction exception. This exception, if you look at the case law, really applies to conditions that are seemingly innocuous, something that doesn't look like it's got to jump out and hurt you like a bonfire, but something like a concrete post, a tire rut in the ground, and the landowner has reason to know that someone's going to encounter these conditions and be distracted when they do. So if you're on a construction site and you're carrying materials and you step into a tire rut, that's when the distraction exception applies. If you're Kmart or Walmart and you've got a concrete post outside and someone's carrying a bulky package and they run into that post, that's when the distraction exception applies. It doesn't apply in a situation where you have a continuous, perceptible danger right behind you that you feel the entire time and you can't be distracted away from the fact that there's a fire behind you. She knows it's there. In the Sandoval case, there was a woman, I think it was in the city of Chicago, that she had walked in on a sidewalk and she's trying to do something with a child. She's got young children, so I understand you're being distracted while you're doing something with your children. And she falls in a rut in the sidewalk. And the court says, if your attention is distracted by your own independent acts, then the exception doesn't apply. You're out of luck. And that's what happened with one of the cars. She's trying to take a good picture. She takes a step back. She doesn't look down. And that's exactly what happened in the Sandoval case where they said it doesn't apply. A landowner can't be held to the impossible standard of preventing every dangerous condition or every possible injury that could occur on their property. That's not what the legal document of duty is intended to do. I think all of these arguments use the same conclusions. When the case law is strongly independent in this case, the fire, the embers, the smoke, the hot logs in the fire are the risks attendant to the open and obvious danger, the open and obvious condition. And Janine Payne had no legal duty to protect against that. The trial court should be informed. Thank you. Thank you, counsel. Mr. Bielek? Good morning. Thank you for having us come down today to argue the case. I would like to take a little bit of a slam on this if I may. I'd like to talk about the cleaning rule of the deck. It's your five minutes, counsel. It's my nickel now. Here's a problem I have from the standpoint of my client, Samuel Payne. The plaintiff filed a fourth omitted complaint, your honors, unverified. Samuel Payne filed in an answer that was verified, and in that answer, and it's in the record at page 370 and also on page 371, Samuel Payne set up certain affirmative defenses, and one of those was that the plaintiff was voluntarily intoxicated with VAC at .145. But more importantly, in the fourth affirmative defense on page 370, we allege that the plaintiff intentionally and voluntarily jumped onto a burning log in the bonfire in order to take a picture of her boyfriend. After jumping onto a burning log, the plaintiff then slid off the burning log into the bonfire's hot ashes. That, your honors, is never denied. As we stand here today, the plaintiff's counsel has never filed an answer as required by, I believe it's rule 182, to deny those allegations. And there again, I think that's very serious when you look at the pleadings. The other problem is you just don't have to look at the pleadings. Could you raise that issue to Judge Lawrence at the hearing and motion the summary judgment? I believe it did, but I think he passed over it. So, what do you want us to do about it? Well, I guess it depends on, you've got a choice of two factual situations if you apply the law strictly here. Did she back into the fire and then trip over something that was round? Or did she jump on the log? Now, the reason I say this is, if you look at C-475, there's a police report here in the record. And there, a co-ed stated to the police officer, the co-ed's name was Melissa Drum, and she stated that she was sitting next to the fire when the girl, Laura McCarl, started walking across a large log that was in the fire. Melissa said that Laura took approximately three steps over the log and then fell with her left leg entering the fire first. Now, that's in the record here, again, not disputed. Well, let me go back. Maybe my question wasn't clear. You're essentially, as you began this argument, said this is a pleading issue or pleading matter. Right. Okay. Are you seeking alternative grounds to affirm on the basis that judgment should have been granted on the pleadings? Yeah, I think it should have. Maybe I missed this. Did you raise this argument in your brief? I raised it not directly. Well, it was sufficiently oblique that I think I missed it entirely, Mr. Biele. How did you raise it indirectly? Well, I stated on page 8 of my prequel recital that I just recited here today, but what I'm suggesting is that there's two factual alternatives. I don't think it makes any difference because if she jumps on the log, that's more egregious, I think, than backing into the evidence. But either way, I think it's a case of open and obvious, as Mr. Bobel argued, and I agree 100% with what he said. But also, it would be a case of assumption of the risk. And this is, I think, still alive and numbering, too. Because if you, for example, stick your hand in the river with rattlesnakes, you're going to have problems. If you jump in a river with rapids, you're going to have problems. Everybody knows if you jump into a fire or back into a fire, you're going to have problems. And the thing that was amazing to me in this case, I don't do that many fire cases. I do arson cases, but this, of course, is different. The thing that's amazing to me was once I researched the Illinois law, and I even went down to the U of I law library to do the national reporting system, I could not find one single case where a plaintiff in a fire case had either stepped in the fire, backed in the fire, or fell in the fire ever once. Apparently, the law is so strong or strict, even a 4-year-old child in Illinois, Mr. Glovell and I cited that case, there was no recovery, which probably by today's standards may be severe. But what I'm saying is that this young lady knew the consequences. If your time is up, I'll give you an opportunity to finish your thought. All right, if I may, at 490 of the record, we had filed a request to admit facts, and she admitted that she would have serious burns if she fell into the bonfire, and then she also admitted that the bonfire could have been seen 50 feet away if you looked at it, and you can see, I don't think in the record it comes up in color, but in the trial record we had the picture in color, you can see this is not a small fire. I think you finished your thought, Mr. Glovell. Thank you very much for having me. I do appreciate it. Thank you. Thank you. Okay, Mr. Angelini, any rebuttals, sir? Just very briefly. Okay. Because your Honor's address is the actual mechanism by which Lauren fell into the fire and burned herself, the actual description and totality of that description on page 598 of the brief, so she takes it step by step where she basically states that she was sitting on the bale of hay, she was backing up, but she doesn't admit or concede the fact that she was backing towards the fire. She was backing into a space between two bales of hay, and it's very explicit on page 70 and 71 of her deposition, and that's on page 598 of the record, where it describes how far away she was. Regarding Mr. Beley's arguments about the verified pleading, the complaint was not verified. He addressed this with Judge Lauren very early on in the case. I don't think there was a court reporter present, and Judge Lauren said, if the complaint's not verified, the rest of the pleadings don't have to be verified. Whether Mr. Beley finds a verified answer or not, that was at least the opinion or the ruling that was given by Judge Laurence, and whether I had to go further and file verified pleadings in my second, third, and fourth amended complaint. So that was addressed by the court. Regarding the affirmative defenses, I think that was also addressed orally with Judge Laurence. He ruled and ruled that that was not the issue before the court. The issue before the court was open and obvious. Judge Laurence ruled upon the description of the incident that was given by Lauren Bacaro, in a light most favorable to her. We just saw it differently. He didn't rule based upon some police report where Lauren Bacaro alleged he was jumping off a log that was gratuitously attached to a motion for summary judgment. I think Judge Laurence was an excellent judge. He looked at it in a light most favorable to Lauren and said, hey, look, I just don't think embers are something that differentiates between a fire. We just saw it differently. I think it is different. And I think the configuration and the synergy between the perimeter of the embers and the fire created a factual question that at least allows me to get to a jury. I know it's a tough case, Your Honor. When I took it, I knew it was a tough case. But I thought it was something, an accident that was foreseeable. Nobody in here should be shocked that the accident occurred and it occurred in this manner, that something like this occurred at an ISU bonfire of this nature. And that's really it to me. It was always about foreseeability. And I understand the difficulty of it, but to the extent that it falls outside of people who placed themselves in the fire, people who jumped into water, people who can appreciate what they're doing and they do it anyway, I think that's where the Lauren Bacaro fact pattern might be a little bit different than some of the other cases that appeared before public judges on the issue of fire. I appreciate the time that you've given me. I know Lauren appreciates the time that you've given us, and I look forward to your opinion. Thank you. Thank you, counsel. Thank you, Mr. Mayor, Madam Vice Mayor. We will recess.